## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| **Stream TV Networks, Inc.**, *et al*. | **Bankruptcy No. 23-10763 (DJB)** |
| Debtors. | (Jointly Administered)[1] |

| | |
|---|---|
| **William A. Homony, in his Capacity as Chapter 11 Trustee of the Bankruptcy Estates of Stream TV Networks, Inc. and Technovative Media, Inc.** | |
| **Plaintiff** | **Adv. No. _____ (DJB)** |
| **v.** | |
| **Rembrandt 3D Holding Ltd., Visual Semiconductor, Inc., Mathu Rajan, Raja Rajan, and Brown and Michaels, P.C.,** | |
| **Defendants.** | |

## COMPLAINT/CLAIMS OBJECTION

### I.    INTRODUCTION

1.    Plaintiff William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee")

of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc.

("Technovative," and collectively with Stream, the "Debtors"), by and through his counsel, Steven

M. Coren, Esquire and Coren & Ress, P.C., files this Complaint and Claims Objection to, *inter*

---

[1] On April 10, 2023, the Court entered an order directing joint administration of the Stream and
Technovative (docketed at 23-10764-DJB) caes. (D.I. 95).

*alia*, (a) avoid and invalidate any/all obligations and associated transfers in connection with a pre-petition and two post-petition agreements among Stream and Defendants, (b) to avoid and recover an unauthorized post-petition transfer from Stream to Defendant Brown & Michaels, P.C. ("B&M"), for the benefit of B&M and/or Defendant Rembrandt 3D Holding LTD ("Rembrandt"), in the amount of $50,000.00, (c) to challenge, object to and invalidate the Proofs of Claim filed against the Debtors by Defendant Rembrandt (the "Rembrandt Claims"), and (d) in the alternative, to subordinate the Rembrandt Claims below those of all other creditors of the Debtors' bankruptcy estates pursuant to Bankruptcy Code 11 U.S.C. §§ 510 (b) and (c).

## II.    JURISDICTION & VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

3.      The Trustee consents to the Bankruptcy Court's entry of final judgment in connection with all claims asserted herein and waives a jury trial before an Article III judge in connection with all claims to which he is entitled to a jury trial under the Constitution and applicable law.

4.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III.   PARTIES

### A.    The Plaintiff

5.      Plaintiff William A. Homony is the duly appointed Chapter 11 Trustee of Debtors' bankruptcy estates.

6.      On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code.

7.     After almost a year of "acrimony" and "relative lack of progress," on January 5, 2024, this Court entered a Memorandum (the "Trustee Opinion") (D.I. #548) and Order which, among other things, appointed a Chapter 11 trustee and granted Debtors' secured creditors—represented by  Hawk Investment Holdings Limited ("Hawk")—relief from the automatic stay to permit Hawk to resume litigation against the Debtors in the Delaware Court of Chancery under § 225 (the "§ 225 Action") of Title 8 of the Delaware Code (the "Trustee Order") (D.I. #549).

8.     The Trustee Opinion held, in relevant part, that, due to the gross mismanagement and lack of transparency under Defendant Mathu Rajan's leadership, (i) a Chapter 11 trustee must be appointed to administer the Debtors' cases, and (ii) Rajan was no longer authorized to act on behalf of the Debtors' estates. (D.I. #548).

9.     On January 9, 2024, the Office of the United States Trustee filed a Notice of Appointment of William A. Homony to serve as the Chapter 11 trustee and on January 12, 2024, the Bankruptcy Court entered an Order appointing William A. Homony as the Trustee (D.I. #558).

**B.     The Defendants**

10.     Defendant Rembrandt 3D Holding LTD ("Rembrandt") is a Nevis Corporation who may be served through its agent Andrew DeMarco, Esquire, c/o Devlin Law Firm, LLC, 1526 Gilpin Avenue, Wilmington, DE 19806.

11.     Defendant Visual Semiconductor, Inc. ("VSI") is a Wyoming Corporation with a place of business at 1105 William Penn Drive, Bensalem, PA 19020.

12.     Defendant Mathu Rajan ("Rajan") is an individual who resides at 1105 William Penn Drive, Bensalem, PA 19020.  At times material hereto, Rajan was the Debtors' CEO, President and Director, while at the same time serving as the founder and CEO of VSI.

13.     Defendant Raja Rajan is an individual and the brother of Mathu Rajan, and Raja

resides at 5215 Bishop View Circle Cherry Hill, NJ 08002.  At times material hereto, Raja Rajan

was Debtors' Chief Operating Officer and General Counsel, and upon information and belief held

similar positions at VSI.

14.     Defendant Brown & Michaels, P.C. ("B&M") is a law firm with offices at 118

North Tioga Street, 4th Floor, Ithaca, NY 14850.

## IV.     **FACTS**

15.     Commencing in or around May 2021, and continuing through the Trustee's

appointment and thereafter, Defendants colluded in an unlawful scheme to take ownership,

possession and control of the Debtors' property—a scheme which included an effort to hinder,

delay and defraud Hawk (who's secured claims exceeded $150 million), and Debtors' other non-

insider creditors.

16.     To place the unlawful scheme in context, it is significant to highlight that VSI

founder and CEO, Mathu Rajan, is the Debtors' CEO, President and Director—who was removed

from operational control by this Court because of gross mismanagement and disqualifying

conflicts. This Court held, *inter alia,* that:

(i)     Debtors, under Rajan's leadership, breached their fiduciary duties to creditors and

disclosure obligations to the Court in failing to disclose that VSI had made millions of dollars of

payments on behalf of the Debtors in return for Debtor stock;

(ii)     Debtors' management, specifically Rajan, contemporaneously and improperly

acted as a fiduciary of the Debtors and VSI;

(iii)     "Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's

overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony . . . was at times

rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness

to draw distinctions between the entities and his roles with each"; and,

(iv)    "Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court

and creditors rises to the level of gross mismanagement of the estates, even when viewed against

the high standard of glaring and inexcusable badness."

Trustee Opinion at 60-61.

17.    Rajan is no stranger to bad faith bankruptcy filings, as he orchestrated two prior

bad faith filings involving Stream, both of which were dismissed by the Delaware bankruptcy

court.

18.    The first was a Chapter 11 case initiated by Stream TV Debtor on February 24,

2021, and docketed *In re: Stream TV Networks, Inc.*, Bankr. D. Del. No. 21-10433-KBO (the

"Delaware Voluntary Bankruptcy Case"), and the second was an involuntary Chapter 7 case

initiated on May 23, 2021, by, *inter alia*, purported creditor Rembrandt, docketed *In re Stream TV

Networks, Inc.*, Bankr. D. Del. 21-10848-KBO (the "Delaware Involuntary Bankruptcy Case").  In

each case, Rajan controlled Stream.

19.    The Delaware Bankruptcy Court dismissed the Delaware Voluntary Bankruptcy

Case on May 17, 2021, as having been filed in a bad faith effort to block the Delaware Chancery

Court Action from proceeding regarding litigation concerning the "Omnibus Agreement" – a May

2020 agreement among Stream, Hawk, Hawk representative Shad Stastney, and 52 of Stream's

stockholders, whereby Stream would transfer its assets to SeeCubic Inc. in exchange for, *inter alia*,

extinguishment of Hawk's debt, see Trustee Opinion at p. 4 – and divert Debtors' property to Rajan

and his alter ego, an entity named Visual Technology Innovations, Inc. ("VTI"),[2] the predecessor

---

[2] VTI—the predecessor to VSI—filed a Chapter 11 bankruptcy proceeding on January 6, 2025 in
the United States Bankruptcy Court for the District of Nevada, docked as 25-10024-abl, to stay a

to VSI.  Trustee Opinion at 6.  A true and correct copy of the Delaware Bankruptcy Court's bench

opinion is attached hereto as Exhibit A.

**The Collusive, Sham Settlement Agreement**.

20.     Less than one week later, Stream, Rajan, Rajan's brother Raja Rajan, an attorney

for Stream and VSI, and Rembrandt executed a collusive/sham Settlement Agreement and Mutual

Release dated May 23, 2021 (the "Settlement Agreement") which, among other things, (a) required

Stream to manufacture and provide to Rembrandt knowingly unattainable quantities of products

deploying so-called "Ultra-D" technology in 4K and 8K along with illusory rights of first refusal

to purchase more than 3 million of such products "At Cost," (b) obligated Stream to make

knowingly unattainable monetary payments, including a downpayment of $1,528,000 along with

knowingly unattainable monthly payments through the term of the agreement which expired on

December 31, 2030, ranging from $28,000 a month to $40,000 a month, (c) granted Stream a non-

exclusive license to purported Rembrandt technologies listed in Schedule A of the Settlement

Agreement, (d) granted 2,000,000 warrants to Rembrandt for Stream stock pursuant to a Warrant

Agreement—which, upon information and belief, was never executed, and (e) provided in

paragraph 4 that commencement of the Settlement Agreement was "triggered upon the execution

of this Agreement and the Warrant Agreement (Exhibit A) ("which is incorporated herein by

reference…").  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit

B.

21.     The same day that Rajan executed the Settlement Agreement—purportedly

granting Rembrandt a sizable, liquidated claim against Stream—Rembrandt, as one of three (3)

---

civil fraud and breach of contract action against VTI and Rajan filed by a VTI investor in the
Eastern District of Pennsylvania, docketed as 2:23-cv-1740-kns.

petitioning creditors, filed the Delaware Involuntary Bankruptcy Case.  Not fooled, the Delaware

Bankruptcy Court again dismissed Stream's involuntary bankruptcy proceeding as a bad faith

filing and imposed a twelve (12) month bar on Stream re-filing for bankruptcy.  Trustee Opinion

at 6. A true and correct copy of the June 10, 2021 dismissal order is attached hereto as Exhibit C.

22.     The timing of the filing of the Delaware Involuntary Bankruptcy Case substantiates

that the Settlement Agreement was a collusive sham, intended to manufacture a fixed "allowed"

claim for Rembrandt to end run the Delaware Bankruptcy Court's dismissal of the Delaware

Voluntary Bankruptcy Case a week earlier by allowing Rembrandt standing (which it didn't

previously have) to act as a petitioning creditor.

23.     The collusive, sham nature of the Settlement Agreement is further confirmed by a

series of emails from Stream representatives on April 20-21, 2021, copies of which are attached

hereto as Exhibit D, which confirm Stream's view during the pendency of the Delaware Voluntary

Bankruptcy Case that Rembrandt's claims in pending but stayed New York federal court litigation

were meritless.

24.     In the New York case, Rembrandt sought unsuccessfully to enforce a settlement

term sheet negotiated by Hawk representative Shad Stastney—when he was the Vice Chairman

and CFO of Stream TV—which in Stream's view "would essentially wreck the company finances"

and "bankrupt Stream." Stream, led by Mathu and Raja Rajan, vigorously opposed and fought for

a determination that the settlement term sheet was not enforceable.  The New York Court

ultimately held that the settlement term sheet was unenforceable and the parties remained in active

litigation over Rembrandt's claims as of the date of the collusive Settlement Agreement.[3]  As Raja

---

[3] Order dated 4/15/2021[D.I. 98] in the United States District Court for the Southern District of
New York, docketed as 17-00882.

Rajan expressed in his email of April 20, 2021 regarding the "Stream TV – Rembrandt litigation" – "Some people think that Shadron signed that settlement term sheet intentionally to bankrupt Stream.  Don't know but that makes a lot more sense in hindsight."

25.     As Rembrandt represented in its objection filed on November 6, 2024 (D.I. 789) to the Trustee's sale motion, at paragraph 44: "On May 23, 2021, Stream and Rembrandt memorialized the Settlement Term Sheet in a more formal Settlement Agreement and Mutual Release (the "Settlement Agreement"), with terms nearly identical to those negotiated in mediation [in the New York case]. The Settlement Agreement granted a non-transferable license for Stream to use the Rembrandt IP in exchange for cash and products valued at approximately $1.2 billion."

26.     Evidencing the collusive, sham nature of the Settlement Agreement, in the week following dismissal of the Delaware Voluntary Bankruptcy Case, business terms which "would essentially wreck the company finances" and "bankrupt Stream" morphed into agreeable terms when needed to support a friendly petitioning creditor who was willing to collude with Rajan and file the Delaware Involuntary Bankruptcy Case to block the Delaware Chancery Court proceeding regarding the Omnibus Agreement, i.e., to hinder, delay and defraud Debtors' creditors.

27.     The Settlement Agreement was a collusive sham, entered into to hinder, delay and defraud Hawk and the Debtors' other non-insider creditors, as further evidenced by, among other things, (a) Stream never complied with any of its monetary or production "obligations" under the Settlement Agreement as it defaulted at moment one by failing to pay the $1,528,000 due upon signing and by the contemporaneous commencement of the Delaware Involuntary Bankruptcy Case, (b) as Defendants knew, the obligations imposed upon Stream were illusory and a sham, as Stream had virtually no money, no operations, no funding, no warehouses, no raw materials, no production capacity and no ability to perform under the Settlement Agreement, and (c) years

passed without Rembrandt declaring a default or seeking to enforce the Settlement Agreement, or to cancel the license and claw back whatever technology, if any, was transferred under the Settlement Agreement.

**Unauthorized Post Petition Agreements/Transactions.**

28.    After the Petition Date and while Debtors remained under Mathu Rajan's control, Stream entered into agreements, effectuated transactions and made a $50,000 transfer outside the ordinary course of business with insiders without seeking or obtaining Bankruptcy Court approval.

29.    The first was an amendment to the Settlement Agreement (the "Settlement Amendment") on August 12, 2023. A true and correct copy of the Settlement Amendment is attached hereto as Exhibit E.

30.    The Settlement Amendment purported to, *inter alia*, (a) obligate Stream to pay $250,000 on account of Rembrandt's attorneys' fees under section 27 of the Settlement Agreement, (b) obligate Stream to pay Rembrandt $2,360,000 on account of past due amounts owed as of August 2023, (c) altered the production and delivery schedules for TVs and displays—an illusory production schedule because Stream was in bankruptcy with no ability to manufacture, produce or deliver the required products, and (d) added provisions that would benefit VSI and deprive Stream of rights in the event Rajan was removed as the principal in control of Stream.

31.    Just two days later, and again without Bankruptcy Court approval, Rembrandt, Stream, and VSI entered into a post-petition licensing covenant (the "Licensing Covenant").  A true and correct copy of the Licensing Covenant is attached hereto as Exhibit F.

32.    The Licensing Covenant clearly prioritized VSI's and Mathu Rajan's interests over the interests of the Debtors and their subsidiaries by expressly barring Rembrandt from issuing licenses to any of Stream's subsidiaries.  Trustee Opinion at 49-50.

33.     The Licensing Covenant was "intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries.  The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia*, Stream's subsidiaries."  Trustee Opinion at 50.

34.     In a stunning admission of fraudulent intent, internal emails dated August 14, 2023 and September 6, 2023 among VSI, Rembrandt and Stream CEO, President and Director Mathu Rajan admit:

> the Licensing Covenant "is intended to 'block' the bad guys [i.e., secured creditor Hawk] w/r/t the Rembrandt technology."  (Email dated August 14, 2023);

> and

> Per the attached Licensing Covenant of August 14, 2023 in which Rembrandt agreed to block licenses to Stastney et al [i.e., secured creditor Hawk], VSI owes a series of monthly cash payments to Rembrandt.

> Attached is the wire confirmation of a $50,000 partial payment #1. Email dated September 6, 2023).

35.     VSI transferred $50,000 to the Debtor in Possession account of Stream at Bank of America (the "DIP Account") on September 5, 2023, in return for shares of Stream.

36.     On September 11, 2023, Stream transferred $50,000 from its DIP account to B&M, Rembrandt's counsel, allegedly on account of VSI/Stream's obligations to Rembrandt under the Licensing Covenant.

37.     The $50,000 post-petition transfer from Stream to Rembrandt's counsel was not approved by the Bankruptcy Court and is subject to avoidance and recovery by the Trustee.

**Rembrandt's Proofs of Claim.**

38.     Not listed by Stream in its schedules as having a claim in the Stream bankruptcy case, on April 14, 2023, Rembrandt filed a Proof in Claim in the amount of $1.2 Billion (the "Stream Claim"). *See*, Claim No. 2-1. A true and correct copy of the Stream Claim is attached hereto as Exhibit G.

39.     As the Declaration of Stephen Blumenthal in support of Rembrandt's claim makes clear at paragraph 12, the Settlement Agreement upon which the claim is based involves a securities transaction:

> 12.     Stream agreed to pay Rembrandt-Holding $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost.

40.     On the Petition Date, Technovative filed its List of Creditors Who have the 20 Largest Unsecured Claims and are not Insiders (the "Top 20 List") and scheduled Rembrandt as its only creditor having a "breach of contract" claim in the amount of $10 million (+) and listed the claim as contingent, unliquidated, and disputed and thus, not an allowed claim (Technovative Bankruptcy Docket, D.I. #1 and #3).

41.     Without explanation, a mere two (2) weeks later, when Technovative filed its Schedules of Assets and Liabilities ("Technovative Schedules"), it listed Rembrandt's claim as having ballooned to $100 million dollars, ten (10) times the original amount, and it was listed by Rajan as underlined: undisputed, noncontingent, and liquidated and therefore, an "allowed" claim for "goods and services." (Technovative Bankruptcy Docket, D.I. #50).

42.     As reflected on its Schedule G, Technovative, a holding company that never had any operations, has no contracts with Rembrandt.  There is no record evidence or other documents supporting Rembrandt's claims against Technovative, and the claim is a sham.

43.     On October 10, 2024, the Trustee filed an amendment to the Technovative

Schedules and listed the Rembrandt claim as contingent, disputed, and unliquidated in the amount of zero dollars.

44.    In response to the Trustee's amendments to the Technovative Schedules, on October 24, 2024, Rembrandt filed a nearly identical proof of claim to the Stream Claim against Technovative for the same $1.2 Billion based on the Settlement Agreement, to which Technovative is not a party (the "Technovative Claim" and collectively with the Stream Claim, the "Rembrandt Claims"). *See*, Claim No. 26-1. A true and correct copy of the Technovative Claim is attached hereto as Exhibit H.

45.    The claim against Technovative is similarly based on the Settlement Agreement and is therefore reliant on a securities transaction.

46.    That the Debtors did not receive reasonably equivalent value in exchange for incurring the obligations contained in the Settlement Agreement, Settlement Amendment and Licensing Covenant is convincingly established by the Rembrandt Claims themselves.

47.    Rembrandt values the benefits to it under the Settlement Agreement at $1.2 billion, the amount which it seeks.

48.    When the Settlement Agreement was executed, the corresponding value to the Debtors was zero—as Debtors were insolvent, had virtually no money, no operations, no funding sources outside of Rajan's efforts to fleece unsuspecting investors in a scheme which smacks of securities fraud, no warehouses, no raw materials, no production capacity and were in the midst of a "friendly foreclosure" under the Omnibus Agreement whereby Stream's property was being transferred to Hawk in return for the extinguishment of Hawk's secured debt.

49.    At all times material hereto, the Debtors were insolvent and attempting to engage in a business for which they were grossly undercapitalized.

## V.    CLAIMS

### FIRST CLAIM – AVOIDANCE OF OBLIGATIONS/TRANSFERS
### (Pursuant to 6 Del. C. §§ 1304(a)(1), 1304(a)(2), and 1305 and 11 U.S.C. § 544)

50.    Paragraphs 1 through 49 above are incorporated herein by reference, as if restated in their entirety.

51.    As of the Petition Date, Stream had numerous general unsecured creditors holding allowable claims who, but for the Debtors' bankruptcy filing, would have standing to bring claims to avoid the obligations or accompanying transfers under the Settlement Agreement, Settlement Amendment and/or Licensing Covenant under 6 Del. Code § 1304(a)(1), 6 Del. Code § 1304(a)(2), and/or 6 Del. Code § 1305.

52.    Debtors incurred the obligations and made transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant with the actual intent to hinder, delay and defraud creditors (including Hawk).

53.    The secured and general unsecured creditors of Debtors were thus foreseeable creditors at the time the obligations under the Settlement Agreement, Settlement Amendment and Licensing Covenant were incurred and the accompanying transfers were made.

54.    Debtors did not receive reasonably equivalent value in exchange for incurring the obligations or making the transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant.

55.    The obligations incurred and the transfers made when Debtors were insolvent constitute avoidable obligations and fraudulent transfers for which the transferee Defendants are liable.

56.    The Debtors were engaged in a business for which the remaining assets of the Debtors were unreasonably small in relation to the business of the Debtors following incurring the

obligations or making the transfers, as set forth above.

57.     Accordingly, the obligations incurred, and accompanying transfers made under the Settlement Agreement, Settlement Amendment and Licensing Covenant are avoidable pursuant to 6 Del. C. §§ 1304 and 1305, and Section 544 of the Bankruptcy Code.

## <u>SECOND CLAIM – AVOIDANCE OF OBLIGATIONS/TRANSFERS</u>
### (Pursuant to 12 Pa. C.S.A. § 5104(a) and 11 U.S.C. § 544)

58.     Paragraphs 1 through 57 above are incorporated herein by reference, as if restated in their entirety.

59.     Debtors incurred the obligations and made the transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant with the actual intent to hinder, delay and defraud creditors (including Hawk).

60.     Debtors did not receive reasonably equivalent value in exchange for incurring the obligations or making the transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant.

61.     The obligations incurred and the transfers made when Debtors were insolvent constitute avoidable obligations and fraudulent transfers for which the transferee Defendants are liable.

62.     The Debtors were engaged in a business for which the remaining assets of the Debtors were unreasonably small in relation to the business of the Debtors following incurring the obligations or making the transfers, as set forth above.

63.     Accordingly, the obligations and accompanying transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant are avoidable pursuant to 12 Pa. C.S.A. § 5104(a) and Section 544 of the Bankruptcy Code.

### THIRD CLAIM – AVOIDANCE OF OBLIGATIONS/TRANSFERS
**(Pursuant to 11 U.S.C. § 549)**

64.    Paragraphs 1 through 63 above are incorporated herein by reference, as if restated in their entirety.

65.    The Settlement Amendment and Licensing Covenant were entered into and the $50,000 transfer to B&M, for the benefit of Rembrandt, was made post-petition, outside the ordinary course of business and without Bankruptcy Court approval.

66.    Accordingly, the Trustee may avoid the obligations and the accompanying transfers, including the $50,000 transfer to B&M, pursuant to Section 549 of the Bankruptcy Code.

### FOURTH CLAIM – REQUEST FOR DECLARATORY JUDGMENT
**(To Void the Settlement Agreement, Settlement Amendment
and Licensing Covenant as Collusive, Fraudulent, the Product
of Breaches of Fiduciary Duty and Ultra vires)**

67.    Paragraphs 1 through 66 above are incorporated herein by reference, as if restated in their entirety.

68.    VSI, Rembrandt and the Debtors' CEO, President and Director, Defendant Mathu Rajan, conspired and colluded with each other to defraud the Debtors and their creditors by entering into agreements and engaging in transactions in furtherance of Defendants' self-interests and contrary to the interests of the Debtors and their non-insider creditors.

69.    The Settlement Agreement, Settlement Amendment and Licensing Covenant were the product of collusive and fraudulent conduct on Defendants' behalf, along with a breach of fiduciary duty on the part of Defendants Mathu Rajan, Raja Rajan, and VSI and aiding and abetting breach of fiduciary duty on the part of Rembrandt.

70.    Given the wrongdoing of the Defendants as aforesaid, the Court should rescind or void the tainted agreements, i.e., the Settlement Agreement, Settlement Amendment and Licensing

Covenant.

## FIFTH CLAIM – REQUEST FOR DECLARATORY JUDGMENT
### (To Void the Settlement Agreement for Failure of Condition
### Precedent and Lack/Failure of Consideration)

71.     Paragraphs 1 through 70 above are incorporated herein by reference, as if restated in their entirety.

72.     The execution and delivery of the Warrant Agreement is a condition precedent to the validity of the Settlement Agreement.

73.     Upon information and belief, the Warrant Agreement was not executed or delivered.

74.     Additionally, the alleged consideration to the Debtors under the Settlement Agreement, Settlement Amendment and Licensing Covenant was illusory and a sham, especially given Debtors' precarious financial condition and its known inability to manufacture or deliver the products for which it was obligated to pay almost $6 million in license fees.

75.     The Settlement Agreement was a collusive sham orchestrated by the parties thereto as a poison pill to sabotage Hawk's ability to realize on its collateral, and to facilitate the confiscation of Debtor property for their own behalf.

76.     Accordingly, the Court should rescind or void the tainted agreements, i.e., the Settlement Agreement, Settlement Amendment and Licensing Covenant.

## SIXTH CLAIM – OBJECTION TO REMBRANDT PROOFS OF CLAIM

77.     Paragraphs 1 through 76 above are incorporated herein by reference, as if restated in their entirety.

78.     For the reasons previously advanced, the Settlement Agreement upon which the Rembrandt Claims are based is a collusive sham which should be avoided or voided and afforded

no validity whatsoever.

79.    Rembrandts damage calculations are based on worthless, "pie in the sky" speculation as to products and profitability.  As Rembrandt and the colluding Defendants knew all along, Debtors had no ability to manufacture or produce any products, let alone the more than 3 million products necessary to support Rembrandt's $1.2 billion "lost profits" damage calculation, and the $400 profit margin is based on nothing but rank speculation.

80.    As to Rembrandt's claim against Technovative, that Debtor was merely a holding company with whom Rembrandt had no contractual or other relationship, and which did not manufacture or sell products.  As such, the claim against Technovative is frivolous.

81.    Rembrandt's Claims are otherwise specious because:

(a) The Settlement Agreement does not obligate Stream to produce and/or sell to Rembrandt a minimum quantity of "Standard Products" and accordingly Rembrandt's "lost profits" claim of $1,206,000,000—which is premised on a non-existent obligation to deliver 3,015,000 3D products—is frivolous.  To the contrary, the Settlement Agreement provides only a right of first refusal to purchase such products if available, "At Cost":

> "Standard Products – As Stream TV builds high-resolution based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost … the minimums provided below….
>
> Rembrandt will have a minimum right of first refusal to purchase Standard Products At Cost on 63,000 units plus 7,000 units/month on execution of this Agreement and then increasing by 1,000 units/month every three months thereafter until the end of the term.

Settlement Agreement, para. 6(b)(2).

(b) As Defendants knew when the Settlement Agreement was executed, there were no "Standard Products" available for sale, as the technology was in the proof-of-concept phase,

Stream was a pre-revenue start up without a developed market for the commercialization of the 3D products, and Stream's secured creditors were in litigation seeking to foreclose on all of Debtors' property.

(c) Stream never produced or had available for sale any of the "Standard Products" upon which Rembrandt basis its $1.2 billion claim—let alone the 3,015,000 units upon which the specious claim depends.

82.    The Court should disallow the Rembrandt Claims under Section 502 (d) of the Bankruptcy Code, and as grossly inflated, specious and unsupportable.

## SEVENTH CLAIM – MANDATORY SUBORDINATION
### (Under Section 510 (b) of the Bankruptcy Code)

83.    Paragraphs 1 through 82 above are incorporated herein by reference, as if restated in their entirety.

84.    The Settlement Agreement involves a securities transaction, as do Rembrandt's Claims.

85.    Under Section 510(b) of the Bankruptcy Code, claims arising in connection with securities transactions, like the Rembrandt Claims challenged here, are subject to mandatory subordination below the claims of Debtors' creditors.

86.    In the event that it is determined that the Settlement Agreement is valid and the resulting warrants granted to Rembrandt under the terms of the Settlement Agreement were in fact issued, the Court should subordinate the Rembrandt Claims below those of the Debtors' creditors.

## EIGHTH CLAIM – EQUITABLE SUBORDINATION
### (Under Section 510 (c) of the Bankruptcy Code)

87.    Paragraphs 1 through 86 above are incorporated herein by reference, as if restated in their entirety.

88.      As set forth in detail above, Rembrandt engaged and/or knowingly participated in inequitable conduct with respect to the Debtors, including: (i) colluding with Debtors' fiduciaries to hinder, delay and defraud creditors, (ii) entering into a sham Settlement Agreement to manufacture a friendly creditor, i.e, Rembrandt, as a petitioning creditor in a bad faith involuntary bankruptcy proceeding, (iii) aiding and abetting the breach of fiduciary duty by Debtors' fiduciaries, and (iv) conspiring with Debtor fiduciaries to wrest control of Debtor property for the benefit of the Defendants.

89.      After it became clear that the Trustee would settle with Debtors' secured creditors and offer Debtor property for sale, Rembrandt colluded with VSI and Mathu Rajan to sabotage the Trustee's efforts by, among other things:

(i) Promoting false and misleading statements regarding the Trustee's efforts to sell the Debtors' assets, which specifically excluded Rembrandt's alleged intellectual property;

(ii) Threatening the Trustee and his professionals as well as any potential buyer with criminal and civil liability related to Rembrandt's alleged intellectual property despite knowing that it was specifically excluded from the APA.  Rembrandt's arguments and actions chilled any potential parties' interest in the Debtors' assets;

(iii) Promoting false and misleading statements regarding the status of the Philips license and impact on the sale.  (Leia, the current owner of the Philips license, filed a reservation of rights specifically refuting Rembrandt's claims).  The Philips license was never property of the Debtors' estates that the Trustee was seeking to sell;

(iv) Making false and misleading statements to the Court that the Trustee had viable alternative reorganization options; and,

(v) Routinely filing meritless objections to sabotage the Trustee's efforts to maximize value

for the benefit of creditors.

90.     As a result of this inequitable conduct, non-insider creditors have been injured, and Rembrandt has obtained an unfair advantage over those creditors.

91.     Given the willful, unfair, bad faith, and/or inequitable conduct described herein, the Rembrandt Claims should be equitably subordinated below the rights of all other innocent creditors of the Debtors, pursuant to Section 510(c) of the Bankruptcy Code.

### NINTH CLAIM – RECOVERY OF TRANSFERS UNDER 11 U.S.C. § 550
**(Against B&M and Rembrandt)**

92.     Paragraphs 1 through 91 above are incorporated herein by reference, as if restated in their entirety.

93.     The Trustee is entitled to avoid the $50,000 transfer to B&M pursuant to 11 U.S.C. §§ 549, and 544.

94.     Defendant B&M was the initial transferee of a transfer made for Rembrandt's benefit, and if paid over to Rembrandt, Rembrandt is also liable as a subsequent transferee.

95.     Accordingly, the Trustee is entitled to recover the aforesaid transfer, plus interest, pursuant to Section 550 of the Bankruptcy Code.

## VI.   RELIEF REQUESTED

WHEREFORE, William A. Homony, in his capacity as Chapter 11 Trustee of the bankruptcy estates of Stream TV Networks, Inc. and Technovative Media, Inc. demands judgment in his favor and against the Defendants for:

(a) Avoidance of the obligations under the Settlement Agreement, Settlement Amendment and Licensing Covenant, along with avoidance and recovery of all transfers in connection therewith;

(b)  Judgment against Brown & Michaels, P.C. and Rembrandt, jointly and severally, for

the amount of $50,000, plus interest;

(c)  Disallowance of the Rembrandt Claims;

(d)  The entry of a judgment granting mandatory and/or equitable subordination;

(e)  Declaratory relief as requested;

(f)  Pre-judgment interest, reasonable attorneys' fees and costs; and,

(g)  Such additional relief as this Court deems just.


                                        Respectfully submitted,


Dated: April 30, 2025            By:    /s/ Steven M. Coren
                                        Steven M. Coren, Esquire
                                        COREN & RESS, P.C.
                                        Two Commerce Square, Suite 3900
                                        2001 Market Street
                                        Philadelphia, PA 19103
                                        Telephone: (215) 735-8700
                                        scoren@kcr-law.com

                                        Special Counsel to the Trustee