# EXHIBIT A

1
              UNITED STATES BANKRUPTCY COURT
2
                DISTRICT OF DELAWARE

3
                       .   Chapter 11

IN RE:                   .

4
                       .   Case No. 21-10433 (KBO)

STREAM TV NETWORKS, INC.,      .

5
                       .

                       .   Courtroom No. 3

6
                       .   824 N. Market Street

                       .   Wilmington, Delaware 19801

7
                       .

             Debtors.    .   May 17, 2021

8
. . . . . . . . . . . . . . . . .   3:00 P.M.

9
             TRANSCRIPT OF JUDGE'S RULING

          BEFORE THE HONORABLE KAREN B. OWENS

10
            UNITED STATES BANKRUPTCY JUDGE

11
TELEPHONIC APPEARANCES:

12
For the Debtors:         Martin J. Weis, Esquire

13
                    DILWORTH PAXSONLLP

                    704 N. King Street

14
                    P.O. Box 1031

                    Wilmington, DE 19899-1031

15
                    - and -

16

                    Lawrence G. McMichael, Esquire

17
                    Anne M. Aaronson, Esquire

                    Yonit A. Caplow, Esquire

18
                    1500 Market Street, Suite 3500E

19
                    Philadelphia, PA 19102

20

21
Audio Operator:         Madaline Dungey, ECRO

22
Transcription Company:   Reliable

23
                    1007 N. Orange Street

                    Wilmington, Delaware 19801

24
                    (302) 654-8080

                    Email: gMathus@reliable-co.com

25
Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
 1    TELEPHONIC APPEARANCES (Cont'd):

 2    For the U.S. Trustee:      Rosa Sierra, Esquire
                                 UNITED STATES DEPARTMENT OF JUSTICE
 3                               OFFICE OF THE UNITED STATES TRUSTEE
                                 844 King Street, Suite 2207
 4                               Lockbox 35
                                 Wilmington, Delaware 19801
 5
 6    For SeeCubic, Inc.:        Joseph Larkin, Esquire
                                 Jason Liberi, Esquire
 7                               SKADDEN, ARPS, SLTATE, MEAGHER
                                   & FLOM LLP
 8                               One Rodney Square
                                 920 N. King Street
 9                               Wilmington, Delaware 19801

10                               - and -

11                               Eben Colby, Esquire
                                 500 Boylston Street
12                               Boston, MA 02116

13
      For Visual Technology      Jonathan Stemerman, Esquire
14    Innovations:               Rafael Zahralddin, Esquire
                                 ARMSTRONG TEASDALE LLP
15                               300 Delaware Avenue, Suite 210
                                 Wilmington, Delaware 19801
16
                                 - and -
17
                                 John Sten, Esquire
18                               225 Franklin Street, 26th Floor
                                 Boston, MA 02110
19
20    For the Committee:         Christopher Samis, Esquire
                                 POTTER ANDERSON & CORROON LLP
21                               HERCULES PLAZA
                                 1313 North Market Street, 6th Floor
22                               P.O. Box 951
                                 Wilmington, Delaware 19801
23

24

25
```

1    <u>MATTERS GOING FORWARD</u>:

2    Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order
     Dismissing Debtor's Chapter 11 Case [Filed: 3/12/2021; D.I.46]

3

4    United States Trustee's Motion for an Order Dismissing or
     Converting This Case to Chapter 7 [Filed: 3/24/2021; D.I. 84]

5    **Judge's Ruling: 4-20**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 3:07 p.m.)

2      THE COURT:  Good afternoon, parties.  This is Judge

3  Owens.  We're gathered today for a continued hearing in the

4  Stream TV Networks case.

5      I promised you that I would render my oral ruling

6  on the motions to dismiss after the conclusion of the trial

7  last week and I am prepared to do so.  So if you have any

8  issues hearing me please feel free to interrupt given that

9  we're trying to get a complete and accurate record today.  So

10  let me just dive in.

11      So before the court are the motions of the United

12  States Trustee, SeeCubic, Inc., which I will refer to as

13  SeeCubic, and SLS Holdings VI, LLC to dismiss the Chapter 11

14  petition filed by Stream TV Networks, Inc.  The motions are

15  opposed by the debtor and Visual Technology Innovations,

16  Inc., which I will refer to as VTI, but supported by the

17  official committee of unsecured creditors.

18      The court conducted an evidentiary hearing and

19  heard oral argument on the dismissal motions on May 10th and

20  May 11th.  Following the close of argument I took the matter

21  under advisement and advised the parties that I intended to

22  render an oral ruling as expeditiously as possible.  I

23  believe that this is warranted in lieu of a written opinion

24  because I wished to avoid the delay associated with issuing

25  such an opinion and because, among other things, certain

1  aspects of the Ultra-D business as well as other intended

2  business plans of Stream, VTI, and other third parties are

3  dependent on and in some instances, effectively, stayed until

4  this court's ruling on the dismissal motions; however, in

5  rendering this oral ruling I have attempted to be as thorough

6  as possible, so excuse the length.

7          After considering the motions, oppositions thereto,

8  and all related filings, evidence, and argument presented in

9  connection with the dismissal request, as I mentioned, I am

10  not ready to rule.  And for the reasons that I will discuss

11  in more detail I will grant the motions and dismiss the case;

12  however, I am not prepared to do so with prejudice.

13          Let me start with some brief facts.  This case was

14  filed on February 24th, 2021.  It was predated by Stream's

15  May 2020 entry into the omnibus agreement with fifty-two of

16  its stockholders as well as its secured creditors SLS and

17  Hawk.  SLS and Hawk, collectively, assert note claims

18  aggregating almost $150 million secured by liens on

19  substantially all of the debtor's assets.

20          Following an asserted default under the notes the

21  parties entered into the omnibus agreement which provided

22  that SLS and Hawk would not foreclose on their collateral and

23  would accept, in satisfaction of their note claims, delivery

24  of Stream's assets by way of SeeCubic; a new entity to be

25  under the secured creditors control.

1          The omnibus agreement granted the secured

2   creditors, by way of Mr. Stastney, power of attorney to

3   effectuate the asset transfers and allowed Stream's minority

4   investors to swap their shares in Stream for shares in

5   SeeCubic.  Upon the transfer of the assets to SeeCubic the

6   secured notes would be extinguished.  Per the agreement

7   Stream was to receive one million shares of SeeCubic's Class

8   A common stock.

9          Mr. Rajan, Stream's sole director, CEO and

10  controlling shareholder, is not entitled to participate in

11  the omnibus agreement's equity swap, and did not and

12  continues to not support Stream's entry into the omnibus

13  agreement.  Mr. Rajan didn't approve the omnibus agreement on

14  behalf of Stream.  That was handled by a resolution committee

15  comprised of four outside independent directors with the full

16  power and authority of Stream's board to resolve the claims

17  of SLS and Hawk.

18         In September 2020 Stream, under the control of Mr.

19  Rajan, commenced litigation in the Delaware Chancery Court

20  seeking both a determination that the omnibus agreement was

21  invalid and an injunction to prevent SeeCubic from taking any

22  action to enforce it.  Stream argued that the directors who

23  approved the agreement were never validly appointed; the

24  agreement was invalid because it constituted a sale of all of

25  Stream's assets which under Section 271 of the Delaware

1   General Corporation Law required stockholder approval; under

2   its certification of incorporation the agreement required the

3   separate approval of the holders of the majority of the Class

4   B common stock; and finally, that members of the resolution

5   committee breached their fiduciary duties by approving the

6   agreement.  SeeCubic filed a competing request for an

7   injunction.

8           On December 8th, 2020 the Delaware Chancery Court

9   entered an order preliminary enjoining Stream, Mr. Rajan and

10  others from, among other things, taking any action to

11  interfere with the omnibus agreement including, but not

12  limited to, disputing the validity of the agreement except as

13  part of the Chancery Court litigation; interfering with the

14  exercise of the granted power of attorney; asserting

15  ownership rights to any of the assets subject to the omnibus

16  agreement in the stock or comparable equity of Stream's

17  subsidiary, TechnoVative, or those deemed the Dutch

18  subsidiaries; and transferring, liquidating, converting,

19  encumbering or, otherwise, disposing of any of the subject

20  assets in a manner inconsistent with the omnibus agreement.

21          In its opinion accompanying the order the Chancery

22  Court found that Mr. Rajan and his brother, who previously

23  served as a director and officer of Stream, acted by

24  unanimous written consent to expand the board of directors

25  with four outside directors.  It found, at subsequent

1 meeting, the board validly created the resolution committee

2 to negotiate and resolve outstanding claims.  And on My 6th,

3 2020 the resolution committee approved the omnibus agreement

4 and it became effective and binding on Stream.  Stream failed

5 on the remaining issues before the court.

6        Notably, while the Chancery Court grant only a

7 preliminary injunction, the court concluded its lengthy and

8 thorough opinion by holding that it need not enter a

9 mandatory injunction because it was granting a prohibitive

10 injunction preventing Stream from taking action to interfere

11 with the rights of SLS, Hawk, SeeCubic and others under the

12 omnibus agreement including the power of attorney.

13        Nonetheless, the court held that,

14         "Were it necessary to grant a mandatory injunction

15 to enforce the omnibus agreement then the record would be

16 sufficiently clear to support it."

17        The Chancery Court's order and its findings, which

18 although preliminary, are not being challenged by the parties

19 in this proceeding, and are firm, and compelling.

20        Following the entry of the Chancery Court's order

21 the parties proceeded to brief whether a mandatory injunction

22 should be granted to enforce the omnibus agreement.  These

23 cases were filed a few days from the completion of briefing

24 on that issue and, therefore, prior to the court deciding

25 whether a mandatory injunction should be entered.

1      Moreover, this case was commenced prior to the full

2   effectuation of Stream's asset transfer to SeeCubic, the

3   issuance of the SeeCubic shares to Stream, and the

4   extinguishment of the secured lenders claims.  And while the

5   parties debate the extent of the transfers of the assets that

6   were transferred to SeeCubic, which issue is not currently

7   before the court, they do not dispute that the scope of

8   Stream's assets, subject to the omnibus agreement, is broad

9   encompassing substantially all of Stream's prepetition assets

10  including the equity of its foreign subsidiaries.

11      Prepetition these assets aggregated to form

12  Stream's business which was to develop technology and

13  hopefully to commercialize its proprietary Ultra-D

14  technology.  The collective testimony from relevant witnesses

15  is that this technology, developed from technology initially

16  licensed to Stream from Philips, is the Rolls-Royce of

17  "glasses-free 3D" display technology.  This technology allows

18  individuals to view 3D content without the need to wear

19  glasses or goggles.

20      Shortly after the commencement of this proceeding

21  SeeCubic, SLS and the U.S. Trustee moved to dismiss the case

22  with prejudice for cause under Section 1112(b) because they

23  assert that the case was filed in bad faith.  They argue that

24  it was filed not for a proper bankruptcy purpose, but rather

25  to take advantage of the automatic stay, gain a tactical

1   advantage, and collaterally attack the Chancery Court order.

2   Stream and VTI disagree, arguing that the case was filed in

3   good faith to maximize Stream's assets for the benefit of its

4   unsecured creditors who were left behind and not benefited by

5   the omnibus agreement.

6        Pursuant to Section 1112(b) of the Bankruptcy Code

7   the court may dismiss a Chapter 11 case for cause if it's in

8   the best interest of the creditors and the estate.  In the

9   Third Circuit a Chapter 11 petition is subject to dismissal

10   for cause under 1112(b) if not filed in good faith as only

11   the honest, but unfortunate debtor is eligible to avail

12   itself of the protections afforded by the bankruptcy code.

13        Whether the good faith requirement has been

14   satisfied is a fact intensive inquiry in which the court must

15   examine the totality of facts and circumstances and determine

16   where the petition falls along the spectrum ranging from the

17   clearly accepting to the patently abusive.  Among the court's

18   considerations for good faith are whether the petition serves

19   a valid bankruptcy purpose such as preserving a going concern

20   or maximizing the value of the debtor's estate and whether

21   the petition was filed to obtain a tactical advantage.

22        As for the second question, timing is a key

23   element.  Generally the court will evaluate whether the

24   timing of the filing of the Chapter 11 petition includes --

25   indicates, excuse me, that the primary, if not sole purpose

1  of the filing was a litigation tactic; however, the focus on

2  a valid bankruptcy purpose and tactical advantage is not

3  meant to limit the court's consideration of other factors.

4        Courts also look to the Primestone factors which

5  were articulated by the Delaware District Court in the case

6  of Primestone Investment Partners.  And those factors are

7  whether the case is a single asset case; whether there are a

8  few unsecured creditors; whether there is an ongoing business

9  or employees; whether the petition was filed on the eve of

10  foreclosure; whether the matter is a two-party dispute which

11  can be resolved in pending State Court action; whether there

12  is any cash or income; whether there is pressure from non-

13  moving creditors; whether there is a previous bankruptcy

14  petition, the existence of an improper prepetition conduct;

15  whether there is no possibility of reorganization; whether

16  the debtor was formed immediately prepetition; whether the

17  debtor filed solely to create the automatic stay; and finally

18  the subject intent of the debtor.

19        The focus of the good faith inquiry is whether the

20  petitioner sought to achieve objectives outside the

21  legitimate scope of the bankruptcy laws when filing

22  protection under Chapter 11, and no single factor is

23  determinative.

24        I agree with the movants that many of the

25  Primestone factors are present here.  It's undisputed that by

1   virtue of the Chancery Court's order the debtor entered these

2   proceeding without any business operations, employees, cash,

3   income, or ability to generate revenue.  Additionally, Stream

4   has no material assets beyond those which are the subject of

5   the omnibus agreement.

6        As already explained, substantially all of the

7   debtor's assets necessary for a successful reorganization

8   were agreed by the debtor prepetition to be transferred to

9   SeeCubic pursuant to the omnibus agreement and, critically,

10   are the subject of the Chancery Court's order enjoining the

11   debtors and others outside of that litigation from asserting

12   ownership rights in such assets or, otherwise, interfering

13   with the consummation of the omnibus agreement.

14        The other assets Stream relies on to support a

15   reorganization are based on two alternative an lesser quality

16   "glasses-free 3D" viewing platforms upon which Stream did not

17   develop, focus, or, otherwise, rely on prepetition, and the

18   amount to two possible post-petition sales and distribution

19   support agreements of unknown value that depend on

20   contributions of engineers and other specialists that are not

21   yet employees of Stream.

22        Parties have also pointed to Stream's intangible

23   goodwill and NOL's, but such assets alone cannot serve as a

24   basis for reorganization.  These as well as the proffered

25   alternative platform contracts serve as post rationalizations

1   for the filing.  They were not mentioned in Mr. Rajan's

2   initial first day declaration which focused on Stream's

3   Ultra-D assets.  They have been developed throughout the

4   dismissal litigation.

5           While Stream points out that its currently

6   insolvent and in financial distress given that there are

7   approximately $20 million of unsecured claims asserted

8   against it and it has no assets, operations, and current

9   ability to satisfy such claims the court, after considering

10  and weighing the evidence presented, does not believe that

11  this financial distress was the motivating factor for the

12  commencement of these proceedings, nor do I believe that the

13  debtor entered these proceedings with the hope of preserving

14  its business and maximizing its value for the benefit of its

15  creditors and other stakeholders.

16          Rather, the weight of the evidence, including the

17  timing of the filing days before the Chancery Court was to

18  enter a mandatory injunction permanently enjoining the debtor

19  from laying claim to substantially all of Stream's assets,

20  indicates that Mr. Rajan's primary purpose for filing this

21  petition was to gain a tactical litigation advantage that is

22  a part of a continued pattern of effort to nullify,

23  undermine, and/or interfere with the omnibus agreement,

24  vitiate the purpose and effect of the Chancery Court's order,

25  and to maintain ownership and control over the assets of the

1   debtor for his own benefit.

2         Mr. Rajan's prepetition conduct as well as the

3   timeline of circumstances leading to this filing serve as the

4   starting points for this conclusion.

5         First, as detailed in the Chancery Court's order,

6   Mr. Rajan and his brother took improper actions to neutralize

7   the omnibus agreement after it was approved on behalf of

8   Stream by the resolution committee.  When it became clear

9   that the Rajan's would challenge the omnibus agreement there

10  were unsuccessful attempts to reach a resolution with them

11  which followed by the brothers further attempting to nullify

12  the agreement through corporate resolution and through

13  machinations that included trying to change the management of

14  the debtor's subsidiaries and attempting to remove prototype

15  technology from a storage facility.

16        Approximately five months later Mr. Rajan, via

17  Stream, challenged the omnibus agreement in the Chancery

18  Court and sought an injunction barring SeeCubic from

19  enforcing the omnibus agreement.  Following the loss in

20  Chancery Court and the entry of the injunction order Mr.

21  Rajan established VTI of which he is the controlling

22  shareholder, president, and until recently the sole director.

23  Using VTI he began to fundraise using Stream's assets despite

24  the injunction.

25        It is clear, through documentary evidence, that Mr.

1 Rajan intended to use a Stream bankruptcy as a mechanism by

2 which he could, via Stream, regain the Ultra-D assets from

3 the secured lenders and then through VTI obtain them at a

4 fraction of what he believed was the assets' value.

5           It's important to note that while all of this was

6 happening Stream was distressed and some witness testimony

7 indicated that creditors, apart from SLS and Hawk, may have

8 been pursuing Stream for payment, but nevertheless it never

9 sought bankruptcy protection.  It was only when briefing was

10 near complete in the Chancery Court that would have allowed

11 the vice chancellor to enter a mandatory injunction that he

12 previewed to the parties was likely that this proceeding was

13 commenced.

14           This behavior and apparent attempts to avoid the

15 effects of the omnibus agreement and Chancery Court order all

16 for the benefit of Stream's insiders supports the conclusion

17 that Stream did not come to this court as the honest but

18 unfortunate debtor to preserve and maximize value for its

19 stakeholders.

20           The debtor and VTI, however, have urged this court

21 to look beyond the Chancery Court order and prepetition

22 events leading thereto and highlight their plans and ability

23 to put forth a reorganization that would lead to payment, in

24 full, of its creditors including SLS and Hawk if Stream would

25 be permitted to continue with its filing; however, the

1  repeated maneuverings of Mr. Rajan, the timing of the filing,

2  and the initial goals of the proceeding in the face of the

3  Chancery Court's order cannot be ignored or cured.

4        As the Eighth Circuit Court of Appeals aptly opined

5  in the <u>Cedar Shore Resort</u> case,

6        "The taint of a petition filed in bad faith must

7  naturally extend to any subsequent reorganization proposal."

8        It also said,

9        "The possibility of a successful reorganization

10  cannot transform a bad faith filing into one undertaken in

11  good faith."

12        Debtors seeking the protection of the code should

13  act in conformity with the code's underlying principles of

14  equity and fairness, and any debtor who files bankruptcy in

15  bad faith should not be permitted to enjoy the protections of

16  Chapter 11 even though the debtor might be capable of

17  effectuating a reorganization.

18        This observation reigns even more poignant here

19  given that, as readily admitted, the lynchpin of any

20  restructuring centers around rejecting the omnibus agreement,

21  stopping all Ultra-D asset transfers to the secured lenders,

22  recapturing the assets that have been transferred and

23  transferring them to VTI, an entity currently controlled and

24  owned by Mr. Rajan.  These actions are plainly at odds and

25  cannot be squared with the Chancery Court's order and its

1  prohibition on the debtor claiming ownership to the assets.

2       Moreover, whether a benefit can even be achieved

3  for unsecured creditors, if this case were permitted to

4  proceed, is highly questionable given the enormous hurdles

5  that must be overcome.  These include, but are not limited

6  to, a successful rejection of the omnibus agreement and

7  unraveling of the effects of such rejection including a

8  determination as to which assets were transferred to

9  SeeCubic, complex actions to claw-back assets already

10  transferred and perhaps even a motion to lift the stay so

11  that the Chancery Court action can be completed; all of this

12  will be vigorously opposed, lengthy, costly and have less

13  then certain endings, and be value destructive to the Ultra-D

14  business.

15       Even if Stream succeeds the estates will have

16  incurred the estates will have incurred significant

17  administrative expenses and Stream will still need to address

18  the claims and rights of the secured creditors whose claim

19  amounts will only grow as a result of the delay, rejection

20  and attendant litigation.

21       While VTI may have one or more parties that are

22  interested in or committed to providing it with investment it

23  is unclear whether, when and in what amount that funding will

24  materialize, and whether, when and how much Stream will

25  actually receive.  Currently VTI has committed only a small

1   amount to Stream in the form of a $1 million DIP.

2        In an acknowledgement of not only the risk

3   attendant to Stream's urged approach for this proceeding, but

4   the likely avalanche of resulting administrative expenses the

5   committee performed its own investigation and analysis of the

6   issues presented and to be presented in this case and

7   ultimately came to the conclusion that the continuation of

8   this case does not present the best option for the creditors

9   and is unlike to achieve any benefit for them.

10       The committee determined that the case is more akin

11  to a two-party dispute that should proceed outside of

12  bankruptcy.  I appreciate the work the committee has done to

13  afform itself and reach its conclusions. I have given them

14  great consideration and weight in reaching my own conclusions

15  today especially given that according to Stream this

16  proceeding was commenced for the benefit of the committee's

17  constituency to whom the committee owes a fiduciary duty.

18       Faced with the circumstances of this proceeding the

19  committee reached a settlement with SeeCubic that may achieve

20  value for Stream's creditors.  That settlement is not before

21  me today; however the debtor and VTI have argued that the

22  settlement supports that this case was filed in good faith as

23  it achieved something that would, otherwise, not be available

24  to creditors outside the bankruptcy; however, the court

25  cannot agree.

1    The committee is represented by able counsel who

2    used the circumstances presented to the advantage of the

3    creditors.  This does not alter the fact that the debtor did

4    not come to this court in good faith, but rather to make one

5    last ditch effort to take away the value and control given to

6    the secured creditors prior to commencement of this case and

7    to redistribute it back to the Rajan's.

8    Considering all the facts and circumstances

9    presented I have determined that Stream has filed -- excuse

10    me, Stream has failed to adequately fulfill its burden to

11    show that the bankruptcy filing was filed in good faith and

12    for a legitimate bankruptcy purpose.  It was designed to stop

13    SeeCubic and the debtor's secured creditors from fully

14    implementing the omnibus agreement, to unravel it and to

15    avoid the Chancery Court's order and, very likely, a

16    mandatory injunction.

17    I will not permit the bankruptcy process to be used

18    in such a fashion and, accordingly, I will dismiss the case;

19    however, as I mentioned, the case will not be dismissed with

20    prejudice.  Stream has significant unsecured debt and no

21    material assets free of the omnibus agreement.  While I

22    cannot predict how the future unfolds; to be clear, this case

23    is being dismissed as a result of Stream's attempt to

24    interfere with the Chancery Court's order and the omnibus

25    agreement.  So I would expect that any future filing would

1  occur after the completion of the Chancery Court litigation

2  and the omnibus agreement's asset transfers.

3          So for these reasons I am prepared to dismiss the

4  case and I will do so following the conclusion of today's

5  hearing. I hope to get that order entered promptly within the

6  hour.  So unless there is anything further that we need to

7  discuss today we will adjourn today's hearing.

8      (No verbal response)

9          THE COURT:  Okay.  I'm not hearing from anyone --

10 oh, I apologize.  Mr. Larkin?

11         MR. LARKIN:  That wasn't me, Your Honor.  I don't

12 have anything.  We thank Your Honor for your time and

13 attention to this matter.

14         MR. SAMIS:  Your Honor, it was actually Mr. Samis.

15 If I may be heard just briefly.

16         THE COURT:  Okay.  Happy to hear you.

17         MR. SAMIS:  I only will chime-in with one point of

18 clarification.  The qualifier that you attached to your

19 ruling at the end about your expectations that any future

20 filing would happen after the litigation had concluded in the

21 Chancery Court is that a directive that Your Honor is making

22 as part of her order dismissing the case?

23         THE COURT:  It's not a directive.  I think the

24 parties understand. I will not -- my order will not reflect

25 those as conditions.  I just merely proffered my opinion as

1  when I would expect a filing to be commenced in case a

2  subsequent filing is filed in the jurisdiction outside this

3  court and not before myself.

4         MR. SAMIS:  Thank you, Your Honor.

5         MR. LARKIN:  Your Honor, this is Joe Larkin.  I did

6  have one question actually.

7         In our proposed order we didn't include a Rule

8  6004(h) waiver and that was because we didn't think the

9  dismissal order, if one was granted, was approving any use or

10  sale of property of the estate.  So it's our position,

11  subject to reading the order, that it will be final and

12  effective upon entry and we would like to return to the

13  Chancery Court as soon as possible.

14         I just wanted to, I guess, ask Your Honor if you

15  had a different view about that issue and whether we should

16  provide some language.

17         THE COURT:  I did not have a differing view.  I was

18  prepared to enter the form of order that was attached to your

19  motion.  It's slightly different given that there were

20  multiple motions to dismiss filed and that I'm entering it

21  without prejudice, but for the most part it will look, in sum

22  and substance, similar to the order that you submitted.

23         MR. LARKIN:  Thank you.

24         MR. MCMICHAEL:  Your Honor, Larry McMichael.  I'm

25  actually not Amy Caplow [ph].  For some reason I am

 1  misidentified on your screen.

 2          First of all, I agree with Mr. Larkin.  We don't

 3  need a waiver, but we do and will apply for a stay pending

 4  appeal, and we will do that promptly.  So I think the court

 5  would benefit from a written motion rather than oral.  So I

 6  will prepare a written motion and submit it promptly.

 7          THE COURT:  I can tell you that --

 8          UNIDENTIFIED SPEAKER:  Your Honor, may I respond to

 9  that?

10          THE COURT:  I don't think it's needed.  I have

11  given significant thought to this issue actually in

12  anticipation that you were going to move for a stay pending

13  appeal.  And given that I found that this case was filed in

14  bad faith entry of an order staying my order would,

15  effectively, be my actions -- excuse me, would, in my mind be

16  me acting as complicit in the bad faith filing.  So I will

17  not stay my order and I will deny -- excuse me, I will deny

18  that request.

19          Normally I would entertain a brief stay to avoid

20  inconveniencing the District Court because I anticipated

21  parties would ask the District Court for a stay pending

22  appeal, and so it's out of professional courtesy that I would

23  grant a brief stay, but, again, on this record and my ruling

24  I will not do so.

25          MR. MCMICHAEL:  Thank you, Your Honor.

1    THE COURT:  Thank you very much.  That concludes

2  today's hearing.  Again, thank you call for entering my

3  lengthy ruling, but I wanted to give the District Court and

4  other parties a thorough and complete record.  That was my

5  attempt to do so.

6    With that I thank you all for excellent

7  presentations in connection with the trial and for your time

8  and attention to the matter.  We will consider this hearing

9  adjourned.  Thank you all very much.  Take care.

10    (Proceedings concluded at 3:32 p.m.)

11

12

13

14                        CERTIFICATE

15

16    I certify that the foregoing is a correct transcript

17  from the electronic sound recording of the proceedings in the

18  above-entitled matter.

19
   /s/Mary Zajaczkowski          May 17, 2021
20 Mary Zajaczkowski, CET**D-531

21

22

23

24

25