# EXHIBIT B

**THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE** (this "Agreement") is entered into as of May 23, 2021 (the "Effective Date"), by and among, **Stream TV Networks, Inc.**, a Delaware corporation (the "Company" or "Stream TV"), **Mathu Rajan** ("M. Rajan"), and **Raja Rajan** ("R. Rajan," and, together with the Company and M. Rajan, collectively, the "Company Parties"), on the one side, and **Rembrandt 3D Holding LTD**, a Nevis corporation ("Rembrandt") on the other side. Each of the Company Parties and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party".

## BACKGROUND

Stream TV is a Philadelphia-based new media company created to serve a consumer market seeking enhanced entertainment and communications experiences through devices with unlimited accessibility and superior quality;

Rembrandt is the successor to 3DFusion Corp. ("3D Fusion");

On January 6, 2017, Rembrandt filed suit against the Company in the Supreme Court of New York, New York County, which the Company removed to the U.S. District Court for the Southern District of New York captioned Rembrandt 3D Holding LTD v. Stream TV Network, Inc., et al., No. 17 Civ. 00882 (RA) (KHP) (S.D.N.Y.) (the "Litigation");

This Agreement details a global settlement arrangement between Stream and Rembrandt, intended to settle all disputes between them, existing as of the effective date of May 23, 2021 ("Effective Date"). This Agreement is subject to the Protective Order (Docket No. 60) signed by the Parties in the Litigation.

Without admitting liability for any claim or damages, the Parties to this Agreement desire to settle the Litigation and agree to enter this Settlement Agreement and Mutual Release.

NOW THEREFORE, in consideration of the mutual promises, covenants, undertakings and agreements set forth herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

| | | |
|---|---|---|
| 1. | Confidentiality: | The Parties have executed a Protective Order in the Litigation (Docket No. 60) and the terms of the Protective Order shall cover this Agreement. |
| 2. | Costs and Expenses | Each Party shall be responsible for its own costs and expenses in negotiating the terms of this Agreement. |
| 3. | Law: | This Agreement shall be governed by the laws of Delaware, without regard to its conflict of law principles. |
| 4. | Commencement | Commencement of this intended settlement shall be triggered upon the execution of this Agreement and the Warrant |

Agreement (Exhibit A) (which is incorporated herein by reference) and the attached Stipulation Of Voluntary Dismissal Pursuant To F.R.C.P. 41(a)(1)(A)(ii) (Exhibit B) which will be executed immediately after execution of this Agreement.

5. General Release

   a. Each of the Company Parties and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys do hereby fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises, obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have, or have had, past, present, or future, against Rembrandt and its predecessors, successors, affiliates, subsidiaries, agents, officers, directors, members, managers, employees, owners and shareholders, relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

   b. Upon payment of all payments under Section 15. Consideration, each of Rembrandt and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys agree to fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have,

or have had, past, present, or future, against any of the Company Parties and their respective predecessors, successors, affiliates, subsidiaries, agents, officers, directors, employees, and shareholders (and, in the case of M. Rajan and R. Rajan, their respective heirs, personal representatives, executors, and administrators) relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

6. Products

(a) Provision of 4K Units – Stream TV will ship to Rembrandt 100 of the following units: Display/Monitor Model: SC65D21Q-4K 65" Ultra-D Display (the "4K Units"). It is understood by the Parties that the 4K units will be provided "as is" and have no warranty or returnability available. Rembrandt will provide Stream TV with written notice ("Delivery Notice") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice. Stream will pay transportation and all importation costs of these units. Upon execution of this Agreement Stream TV will notify Rembrandt if it will not be able to deliver any of the 4K Units and $5,250.00 will be added to the consideration under Section 15. A. for each 4K Unit that Stream TV can not provide upon execution or Stream TV will agree to provide additional 8K prototype units as a replacement for the 4K units to be delivered at up to 10 units/month starting seven months after Prototype Commencement.

(b) High Resolution Units
    (1) As Stream TV builds 8K resolution units, after the Agreements are mutually executed, Stream will provide Rembrandt with eight prototypes as follows:
        i) the first unit within one month of the first prototype created by Stream TV of an 8K resolution unit after execution of this Agreement ("Prototype Commencement");
        ii) 2 units on or before three months from Prototype Commencement;
        iii) 2 units on or before four months from Prototype Commencement; and
        iv) 3 units on or before six months from

Prototype Commencement.
Stream TV will warehouse such 4K and 8K units (for the 4K units and prototypes of the 8K) in facilities until shipping is requested by Rembrandt to a destination within the United States. Rembrandt will provide Stream TV with written notice ("Delivery Notice of Prototypes") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice of Prototypes. Stream TV will pay transportation and all importation costs of these units. The default is that the Delivery Notice of Prototypes is to the location of 128 Bull Hill Road, Newfield New York, 14867.

It is understood notwithstanding anything to the contrary Stream TV is not obligated to hold those samples for Rembrandt if the is a change to the default location Rembrandt is unwilling to ship the units within seven days of them being completed and in such case Stream TV may use those prototypes for any purpose thereafter without any obligation to Rembrandt.

(2) Standard Products - As Stream TV builds high-resolution based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost, and otherwise at standard commercial terms, the minimums provided below. It is understood by both Parties that Stream TV is not required to change its business model which may or may not include completing finished units. If Rembrandt accepts the order and meet the financial and volume requirements required by Stream TV, then Rembrandt will retain this option. If Rembrandt does not exercise this option with a specific plan within seven (7) business days, then Stream TV can offer this inventory to other customers as needed. Rembrandt will have a minimum right of first refusal to purchase Standard Products At Cost on 63,000 units plus and 7,000 units/month on execution of this Agreement and then increasing by 1,000 units/month every three months thereafter until the end of term.

|   |   |   |
|---|---|---|
|   |   | Such minimum right of first refusal is cumulative and if Stream TV is not in production or Rembrandt does not use such right within a given month it carries over to future months. Rembrandt may purchase additional units by paying standard commercial terms with most favored nation status on a per unit price basis and similar shipping terms. At present the following products defined in the attached specification sheets provided by Stream TV on June 13, 2019 are Standard Products attached hereto as Exhibit B, which is incorporated herein by reference.) |
|   |   | (3) Title for each of the Units shall transfer to Rembrandt, and risk of loss will be assumed by Rembrandt, upon delivery of each such Unit. |
|   |   | (4) Tax Matters. Rembrandt shall be solely responsible for any taxes chargeable to the purchaser of goods in connection with or arising out of the transfer of the Units. Stream TV shall be solely responsible for any taxes chargeable to the seller of goods in connection with or arising out of the transfer of the Units. |
| 7. | OEM | Stream TV in good faith is not finishing products but will recommend to Rembrandt certain Original Equipment Manufacturers ("OEM") that Rembrandt may wish to utilize after it fully investigates the finished products capabilities under its specifications; however, the selection of OEM(s) is at Rembrandts discretion. In such case Stream TV will provide the 3D components directly to the OEM with Rembrandt's specifications. |
|   |   | White Label - Rembrandt may brand product purchased from Stream TV with Rembrandt trademarks. Rembrandt will not remove any patent number marking applied by Stream. |
| 8. | Term | The Term of the Agreement shall continue through December 31, 2030. |
| 9. | Rembrandt Grant of Rights | Rembrandt hereby grants a non-exclusive license to Stream TV to all Rembrandt Technologies listed in Schedule A to this |

| | |
|---|---|
| | Agreement for Rembrandt. |
| 10. Stream Grant of Rights | Stream TV hereby grants Rembrandt a non-exclusive license to any existing Stream technologies that Stream TV has the right to license/sub-license solely to enable Rembrandt to distribute Products described herein. Rembrandt shall obtain or reimburse Stream for Stream's Philips license as part of the At Cost price, as applicable. |
| 11. Field | The licensed field of use from Rembrandt to Stream TV is all applications

The licensed field of use from Stream TV to Rembrandt is all applications. |
| 12. Territory | All territories whether or not patents are issued or pending or licensed. Sale to any distributor in any territory is permitted for the Field. |
| 13. Co-Marketing | Rembrandt and Stream TV shall work cooperatively to educate and co-market the benefit of the no glasses 3D technology and agree to not disparage the other Party.

Stream will be responsible for its own sales and marketing expenses and Rembrandt will be responsible for their own sales and marketing expenses. |
| 14. Sub-license | Either Party may sublicense their rights to other parties for the purpose of having products distributed by the Party. |
| 15. Consideration | In addition to the product provided as consideration and described above, Stream TV shall provide the following as consideration:<br>a) Upon execution of this Agreement, Stream TV agrees to pay to Rembrandt the lump sum of one million five hundred twenty eight thousand ($1,528,000) USD and is due immediately.<br>b) Stream TV is providing warrants equal to X% of the outstanding stock in Stream TV after Stream TV has raised at least sixty million dollars in capital in excess of all outstanding debt and currently liabilities, with provision of a cashless exercise price at a $$Y value per warrant, pursuant to the attached Warrant Agreement (Exhibit A), which is incorporated herein by reference. |

"X%" shall be equal to the 2,000,000/(the number of shares in Stream TV outstanding on April 9, 2019). "$Y value" shall be equal to (the book equity value of Stream TV at issuance)/(the number of shares in Stream TV outstanding at issuance)

c) Stream TV will pay Rembrandt a monthly fee ("Monthly Payment") beginning with the execution of the Agreement for the full Term of this Agreement, according to the following schedule:
   a. 12 months @ $28,000/per month
   b. 12 months @ $32,000/per month
   c. 12 months @ $36,000/per month
   d. 79 months @ $40,000/per month
   
   The monthly payments shall be accelerated upon a merger, acquisition, or change of control. No acceleration by IPO.

16. Payments

Stream TV shall pay each Installment and Monthly Payment by wire transfer of immediately available funds to an account designated by Rembrandt in writing below, or otherwise designated by Rembrandt in writing and delivered to mathu@streamacquistiongroup.com:

Eng Law Firm, Attorney Trust Account [TD Bank A/C# 4327484509 ABA# 031201360].

17. Representations and Warranties

The Parties represent and warrant to one another that they will not bring a trade secret claim based upon any information that is the basis for the Litigation or was otherwise disclosed of learned during the pendency of the Litigation.

Stream TV represents and warrants that it has not revived and will not revive any abandoned patents or patent applications that were abandoned prior to the Effective Date.

Each of the Parties hereby represents and warrants to the others that, as of the Effective Date, (i) it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery, and performance of this Agreement have been duly authorized by all necessary corporate or company action on its behalf, (iii) this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation enforceable against it in accordance with the terms

{00843971.DOCX 1}


of this Agreement, (iv) each individual signing this Agreement in a representative capacity acknowledges and represents that he/she is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated Party; and (v) the agreements and understandings identified herein constitute all of the agreements and understandings between and among the Parties with respect to the subject matter hereof.

18. Notices

Notices required by this Agreement shall be submitted either by any form of overnight courier or by hand delivery, and simultaneously by e-mail, as follows:

To Stream TV, ~~Raja Rajan &~~ Mathu Rajan:
Stream TV Networks, Inc
2009 Chestnut Street
3rd Floor
Philadelphia, PA 19103
~~Attention:~~ General Counsel, Mathu and/or Raja Rajan individually

and

XXX

To Rembrandt:
128 Bull Hill Road
Newfield, New York 14867
Attention: Stephen Blumenthal
Email: Stephen3d@mac.com

and

Eng Law Firm
369 Lexington Ave., 2nd Floor
New York, New York 10017
Attention: Chi Eng
Email: chi@englawfirm.com

Brown & Michaels, PC
118 N. Tioga St, 4th Floor
Ithaca, NY 14850
Attention: Christopher Michaels
Email: michaels@bpmlegal.com

| | |
|---|---|
| 19. Advice of Counsel | Each Party has been represented by counsel of its own selection, has reviewed this Agreement, has had the terms of this Agreement explained by counsel, and understands the contents and effect of this Agreement. Each Party enters into this Agreement wholly upon each Party's own respective judgments, beliefs and knowledge of the matters set forth herein and on the advice of each Party's own respective attorneys. |
| 20. Entire Agreement | It is expressly understood and agreed that this Agreement along with all of the following documents: 1) the Warrant Agreement; and 2) the Protective Order in the Litigation (Docket No. 60) constitutes the entire and complete understanding and agreement among the Parties hereto in regard to the subject matter of the dispute described above and the terms hereof, and supersedes and replaces all prior negotiations, agreements or understandings among the Parties, whether written or oral, concerning the subject matter of this Agreement. Each of the Parties acknowledges and represents that no other Party or agent or attorney of any other Party has made a promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter of this Agreement. Each Party acknowledges and represents that it has not executed this Agreement in reliance upon any promise, representation, or warranty whatsoever that is not expressly set forth in this Agreement. |
| 21. Severability | If any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Agreement, and the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be adversely affected or impaired, and shall remain in full force and effect. |
| 22. Binding Effect | This Agreement shall be binding on, and shall be enforceable against, and shall inure to the benefit of the Parties to this Agreement and their respective past and present officers, directors, affiliates, member firms, subsidiaries, parents, successors, shareholders, members, partners, general partners, limited partners, principals, participating principals, managing members or other agents, management personnel, attorneys, servants, employees, representatives of any other kind (and any officers, directors, members or shareholders of |

| | |
|---|---|
| | any of the foregoing which are not natural persons), spouses, estates, executors, estate administrators, heirs, and assigns. |
| 23. Waiver and Amendment | No provision of or rights under this Agreement may be waived or modified unless in writing and signed by the Party whose rights are thereby waived or modified. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided. This Agreement may not be amended except through an instrument in writing signed by the Parties hereto. |
| 24. Further Assurances | Each Party shall cooperate fully in the execution and delivery of this Agreement and shall take, or cause to be taken, such further action as may be reasonably necessary or appropriate to effectuate or facilitate the terms of this Agreement, including the execution and delivery of any further documents that may be necessary or appropriate for that purpose. Each Party further agrees to take no action, directly or indirectly, to avoid or circumvent, in whole or in part, the terms of this Agreement. |
| 25. Costs | The Parties acknowledge that each Party is to bear its own costs, fees, and expenses, including attorneys' fees, incurred in connection with the dispute giving rise to this Agreement. |
| 26. Dispute Resolution | In the event of a dispute arising from this Settlement Agreement, the parties agree to resolve such dispute in good faith within fifteen (15) business days of receipt of notice of such dispute. If the parties fail to resolve such dispute, the parties consent to initially seek mediation by the Court in the Litigation, which Court the parties also agree shall maintain jurisdiction over any dispute arising from this Agreement. |
| 27. Right to Attorney's Fees in Case of Breach | In the event of any dispute or litigation arising out of or concerning this Agreement, the prevailing Party shall be entitled to an award against the non-prevailing Party of its reasonable attorney's fees and costs. |
| 28. Headings | The various headings of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement. |

{00843971.DOCX 1}

| | |
|---|---|
| 29. Counterparts and Transmission of Signatures | This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Original signatures transmitted by electronic mail or facsimile shall be deemed to be original signatures. No Party shall be bound hereby unless and until all other Parties have executed this Agreement. |
| 30. Authorized Signature | Each individual signing this Agreement in a representative capacity acknowledges and represents that he is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated corporation, partnership, limited liability company, trust or other entity. |
| 31. Joint Preparation | This Agreement shall be deemed to have been prepared jointly by the Parties, and any uncertainty or ambiguity existing herein shall not be interpreted against any Party by reason of its drafting of this Agreement, but shall be interpreted according to the application of the general rules of interpretation for arm's length agreements. |

IN WITNESS WHEREOF, the Parties do hereby execute this Agreement by duly authorized representatives as of the Effective Date:

| **Signed for and on behalf of Defendants:** | **Signed for and on behalf of Plaintiff:** |
|---|---|
| */s/ Mathu Rajan* | */s/ Stephen Blumenthal* |
| Signature | Signature |
| STREAM TV NETWORK, INC., | REMBRANDT 3D HOLDING LTD |
| By: Mathu Rajan, Chief Executive Officer | By: Stephen Blumenthal, President/CEO |
| Date: May 23, 2021 | Date: May 23, 2021 |

*/s/ Mathu Rajan*

Signature
Mathu Rajan, Individually

Date: May 23, 2021

*/s/ Raja Rajan*

Signature
Raja Rajan, Individually

Date: May 23, 2021

{00843971.DOCX 1}

## SCHEDULE A

1. Know how and trade secrets related to methodology for:
   a. efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology
   b. utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.
   c. utilizing the On Screen Display functions of Borders and "Liveliness."
2. Trademarks
3. The patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

**Exhibit A**

**(Warrant Agreement)**

{00843971.DOCX 1}
EAST\165770618.1

# Exhibit B

## (Standard Products)

{00843971.DOCX 1}